# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| BELL INCORPORATED,<br><br>                              *Plaintiff,*<br><br>                    v.<br><br>GE LIGHTING, LLC<br><br>                              *Defendant.* | CASE NO. 6:14-cv-00012<br><br><br>MEMORANDUM OPINION AND ORDER<br><br><br>JUDGE NORMAN K. MOON |

This case comes before this Court on Bell, Inc.'s Motion to Compel (docket no. 1) compliance with a subpoena duces tecum issued in the United States District Court for the District of South Dakota ("D.S.D.") on December 2, 2013 (hereinafter "Subpoena" or "December 2 Subpoena").[1]  Bell, Inc. ("Plaintiff" or "Bell") filed the underlying litigation in the United States District Court for the District of South Dakota, claiming GE Lighting, LLC ("Defendant" or "GE") infringed a patent regarding light-bulb packaging that Bell initially acquired from iPack, Inc.[2] ("iPack").  The December 2 Subpoena seeks a broad range of documents related to GE's counterclaim in the South Dakota litigation that the patent underlying that suit is invalid because iPack or its predecessor in interest "failed to disclose prior art and/or acquired the patent through inequitable conduct."  Bell's Br. in Supp. of Mot. to Compel 1.

Bell, GE, and iPack originally began conferring about production in August 2013, after an initial subpoena issued in D.S.D.  Ultimately, the parties could not agree on whether Bell and

---

[1] The Motion to Compel also seeks "payment of attorney fees and expenses related to Plaintiff's subpoena," an issue which will be discussed more fully below.  Mot. to Compel 1.

[2] iPack is the successor in interest to New Dominion Packaging ("NDP"), the company that original dealt with Bell regarding a provisional application for a light bulb packaging patent.  The agreement that encompassed those dealings bound NDP's successors in interest.  Therefore, I will refer to iPack throughout this opinion to signify both entities.

GE should pay for about $14,000 of the $16,830 cost of production. The December 2 Subpoena demanded production by December 10, 2013. After not hearing from iPack, Bell filed this Motion to Compel on March 3, 2014.[3] iPack responded to the Motion to Compel on April 4, 2014, with a Motion to Quash the Subpoena ("Motion to Quash") (docket no. 9), in which it requests that this Court either quash the Subpoena, or alternatively, "specify[] conditions for production that ensure that iPack will be reasonably compensated for the expenses incurred incident to production." Mot. to Quash 1. Bell replied on its Motion to Compel, and on April 17, 2014, this Court held a hearing on the motions.

The parties dispute whether Bell and GE[4] should have to pay the total bill of $16,830 that iPack incurred in production, including: $1,372.49 to image and copy electronic information from old hard drives; $4,770 to set up a searchable database, load the documents into the searchable database, and apply search parameters agreed upon by the parties; and $10,687.51 for iPack's attorneys and staff to identify privileged, irrelevant, or non-responsive documents among those that matched the search parameters.

## II. BACKGROUND[5]

Bell is a South Dakota corporation, and iPack is a corporation organized under the laws of Virginia. Neither Bell nor iPack disputes that this Court has jurisdiction over them or over the

---

[3] iPack emailed an objection to the Subpoena to GE and Bell's counsel on December 16, 2013, but the email landed in spam folders for both sets of counsel, undiscovered until after iPack inquired into the matter in March 2014.

[4] Although GE was involved in corresponding with iPack over production costs, it has not appeared before this Court, nor has it participated in the Motion to Compel in any way. This Court lacks jurisdiction to charge GE with production costs. *See Admin. Subpoena Walgreen Co. v. U.S. Drug Enforcement Admin.*, 913 F. Supp. 2d 243, 252 (E.D. Va. 2012) (finding no jurisdiction for motion to compel, in part because the Federal Rules of Civil Procedure are not statutes, or "laws [or] treaties of the United States" within the meaning of 28 U.S.C. § 1331, and the Rules "cannot create or withdraw federal jurisdiction."); 28 U.S.C. § 1331; 28 U.S.C. § 1332 (requiring more than $75,000 in controversy).

[5] Bell and iPack generally agree on the facts, except on whether and to what extent iPack infringed the agreement it made with Bell about its provisional light-bulb packaging patent, and on whether that makes iPack an interested party to the South Dakota litigation.

Motion to Compel. Bell and GE are involved in litigation over a light bulb packaging patent in D.S.D. iPack is a successor in interest to New Dominion Packaging ("NDP"), and in that form iPack used to manufacture packaging materials. Of late, iPack has been involved in out-of-court liquidation proceedings and says its "only substantial remaining asset is a 123,000 square foot manufacturing plant/warehouse located in Lynchburg . . . which it leases to various entities to generate funds to service the debt." Br. on Mot. to Quash 3. It notes that any necessary expenses of iPack are now borne by its principals, given this limited income-generating capacity.

At the hearing, Thomas Scott, an officer for iPack, testified that iPack has been involved in two separate acquisitions. Scott testified that iPack was reticent to turn over discovery to Bell and GE without first conducting its own relevance and privilege review over concerns about disclosing "personal" and financial information of its owners, employment data about former employees of its predecessors in interest, and information about the liquidation and creditors of those predecessors in interest, including NDP. The transactions to which Scott refers involve iPack's predecessor in interest, NDP, and another related company called Old Dominion Packaging ("ODP"). There has been continuity of ownership between NDP, ODP, and iPack, according to Scott. ODP was owned by the Buehler family, and Fred Buehler, Scott's father-in-law, was the CEO of ODP. Scott's wife is involved with NDP, his father-in-law is the retired CEO of ODP and is now helping to keep iPack afloat as it operates at a loss. Scott testified that he and Buehler have been paying the legal fees for iPack.

According to Scott, iPack continues to liquidate its assets but is not attempting to sell intellectual property or light bulb packaging designs. When asked whether any of the information on the hard drives requested by Bell and GE has value for iPack as part of this liquidation or otherwise, Scott confirmed there is no value for iPack in this information.

## A. The patent and dispute between Bell and GE

The underlying dispute between Bell and GE has involved iPack from its inception. iPack had been providing light bulb packaging for GE, and had applied for a provisional patent for this packaging in April 2003.[6] Bell wanted to expand its packaging business and "approached iPack about acquiring iPack's intellectual property [in the light bulb packaging] and its light bulb packaging relationship with GE." Br. in Supp. of Mot. to Compel 3. Bell and iPack entered into a formal agreement on October 5, 2004 in which "iPack would receive consideration . . . if Bell and GE made arrangement to produce iPack's alleged intellectual property," after iPack introduced the two parties. Br. in Supp. of Mot. to Compel 4. Paragraph E of that agreement warranted that iPack[7]:

> [H]as no actual knowledge of, nor has it received notice of, any allegations or charges of infringement on the underlying process which is the subject of the Application. For purposes of this agreement, a default by [iPack] will be deemed to have occurred if (1) [iPack] fails, or is unable, to assign title to the [patent] Application, free and clear of all encumbrances, or (ii) [iPack] has breached its warranty regarding no infringement.

Br. in Supp. of Mot. to Compel, Ex. C, ¶ E. The agreement also required Bell's intellectual property counsel to conduct a patent search "with the Patent and Trademark Office . . . to determine if there exists a claim on the process underlying the Application which would diminish the value fo the Application to Bell." Br. in Supp. of Mot. to Compel, Ex. C, ¶ X. Bell did so, finding no relevant prior art.[8]

---

[6] GE's Answer in the D.S.D. litigation alleges that prior to filing its provisional patent, two of the named inventors on that application, including Thomas Scott, gained information from GE employees about the design of the light bulb package that later became the subject of Bell's patent. *See* Answer at 7, ¶ 23, Bell, Inc. v. GE Lighting, LLC, No. 4:13-cv-04009 (D.S.D. May 24, 2013), ECF No. 8.

[7] The agreement was actually between New Dominion Packaging ("NDP") and Bell, but the parties agree iPack is NDP's successor in interest.

[8] Black's Law Dictionary defines "prior art" as: "Knowledge that is publicly known, used by others, or available on the date of invention to a person of ordinary skill in an art, including what would be obvious from that knowledge.

GE has counterclaimed in the South Dakota litigation that iPack produced packaging prior to 2003 that constituted relevant prior art, but went unpatented. GE claims the provisional patent application iPack made regarding light bulb packaging, which formed the basis for Bell's patent of that packaging, is thus invalid because of this relevant prior art. Bell argues iPack should have disclosed this information to Bell under their October 5, 2004 agreement, but claims iPack never did so. Therefore, Bell's IP counsel was unable to evaluate those "documents for their impact on the patent," and its review for prior *patented* art with the U.S. Patent and Trademark Office did not reveal those documents. *See* Br. in Supp. of Mot. to Compel 4.

In 2004, after executing the agreement, Bell began manufacturing light bulb packaging for GE, and on April 15, 2008, Bell obtained a patent for the packaging based on the provisional patent application originally submitted by iPack. GE eventually moved much of its packaging production overseas and reduced orders from Bell. Bell "soon discovered that GE was manufacturing and/or selling packaging that Bell believed infringed" the patent originating with iPack's provisional application. Br. in Supp. of Mot. to Compel 5. Bell accordingly filed suit in D.S.D., alleging that GE knowingly infringed its patent. GE counterclaimed that the patent and iPack's original provisional application "were invalid due to undisclosed prior art and inequitable conduct by iPack." *Id.*

## B. The Discovery Dispute

In the South Dakota litigation, Bell and GE agreed to begin by investigating GE's claims about the invalidity of the patent. Bell began corresponding with iPack's counsel on July 15,

---

Prior art includes (1) information in applications for previously patented inventions; (2) information that was published more than one year before a patent application is filed; and (3) information in other patent applications and inventor's certificates filed more than a year before the application is filed. The U.S. Patent and Trademark Office and courts analyze prior art before deciding the patentability of a comparable invention." "Art," Black's Law Dictionary (9th ed. 2009) (citing 35 U.S.C. § 102).

2013, when Bell sent iPack a litigation hold letter. iPack's counsel agreed to service, and Bell served a subpoena on iPack in August 2013, by U.S. mail. By September 10, 2013, iPack had found 11 GB of data on old hard drives no longer in use. Bell's counsel suggested to iPack that it turn over the entire amount of data, with a corresponding agreement and claw back provision. *See* Br. in Supp. of Mot. to Compel, Ex. H. iPack refused this option, preferring instead to keep the data and run search terms to find responsive information. *Id.* iPack sent Bell proposed search terms on September 10, 2013, and represented that it "should be able to have the search completed and the documents ready for production" in about one week's time. *See id.*, at Ex. G. On September 18, 2013, GE sent additional search terms to iPack for inclusion, at which time iPack agreed to search for the records based on an agreed list of terms. *Id.* at Ex. J.

On September 30 and October 3, 2013, GE and Bell contacted iPack to check on the status of production, as neither had heard from iPack. *Id.* at Exs. K & L. iPack responded on October 3 that the original hard drive did not have the documents as expected, and iPack had to procure and image other hard drives for the information. *See id.* at Ex. M. iPack noted it had just received the full set of potentially responsive documents and had begun reviewing them, absent one potentially responsive hard drive that would arrive soon. *Id.* iPack's counsel represented that iPack "should be able to send [GE and Bell] the responsive documents next week." *Id.* That week and the next, on October 11 and 15, 2013, counsel for Bell contacted iPack to check on the status of production, with no response until October 16, 2013. *See id.* at Exs. N and O.

On October 16, 2013, the first discussion of costs appears in the emails submitted to this Court. iPack's counsel noted "over 5,000 documents . . . came through the search filters because some of the search terms pulled in completely irrelevant documents," and represented iPack was

getting the documents ready as quickly as it could, hoping to finish in less than one week. *Id.* at Ex. O. In that same communication, iPack noted it had "started to receive invoices for the costs associated with this document production," and asked "[h]ave you all decided how the costs will be split for document production?" *Id.*

Between October 16 and 26, 2013, the parties attempted to come to a confidentiality agreement or stipulation before iPack turned over production. The parties submitted a stipulated protective order to the district court in South Dakota on October 22, 2013, but did not wish to wait for its delayed entry to receive the documents. *See id.* at Ex. Q. iPack acknowledged this protective order on October 24, 2013, in an email, saying it had "the initial group of approximately 2,500 documents ready to send, and the rest are being finalized for production such that we should have additional groups ready tomorrow and beginning of next week to complete it, *but we would like to have an Order of the court governing the production.*" *See id.* at Ex. P (emphasis added). The next afternoon, on October 25, 2013, iPack forwarded a draft of an "interim confidentiality agreement," ostensibly something the parties could sign while awaiting the court's protective order.[9] *See id.* at Ex. R.

The interim confidentiality agreement included provisions requiring Bell and GE to destroy or send back any privileged or protected documents iPack inadvertently disclosed, without recourse for disputing whether the documents were privileged except by disputing the

---

[9] I note that the correspondence submitted with the Motion to Compel belies assertions by iPack's counsel at the hearing that she attempted to obtain agreement on the costs through the confidentiality agreement, but that instead, the other attorneys somehow sneakily filed a protective order she had never seen in D.S.D. From the correspondence, it appears the parties had discussed this protective order with iPack's counsel, filed it on October 22, 2013, she asked about its status on October 24, 2013, it was not approved by the D.S.D. Court until October 28, 2013, and in the meantime, on October 25, 2013, iPack's counsel submitted a confidentiality agreement to the parties. The parties rejected this agreement after requesting and obtaining figures detailing the costs of discovery, which the confidentiality agreement required Bell and GE to pay in full. *See* Mot. to Compel, Exs. P-T; Confidentiality Agreement, Ex. R, ¶ 11. iPack's Brief in Support of the Motion to Quash even notes, "it was agreed counsel for iPack would draft a confidentiality agreement relating to the documents, as such an agreement had not been entered by [the district court in D.S.D.] where litigation was pending." Br. in Supp. of Mot. to Quash 5.

classification in court after destroying or returning the documents. *See* Confidentiality Agreement, Ex. R, ¶ 9. It also stipulated that Bell and GE should "agree to inform NDP of the apportionment" of costs between them by October 30, 2013, "at which time NDP shall send an invoice for costs associated with NDP's production of Documents, and production of additional documents by NDP may be withheld unless and until payment is made for the costs." *Id.* at Ex R., ¶ 11. No specific cost estimates had been discussed. Bell and GE made changes to the agreement and requested that the specific amount of costs be added to it. *Id.* at Ex. S. On October 28, 2013, GE inquired again about the costs, as iPack had not yet supplied them. Later that day, iPack disclosed the following costs:

> $1,372.49 for imaging and copying of the drives by external company
> $2,385.00 coordination with outside vendor, loading of documents in database, applying search parameters, bates numbering, copying them to pdf for production
> $8,848.00 compilation and review of documents for relevance for production
> Estimate for future costs to completion $2,000
> Total: $14,000

*See id.* Ex. S.

On October 29, 2013, iPack wrote back that it had finalized documents to send and asked how it should proceed. Bell replied that iPack should "send the link at your earliest convenience." *See id.* at Ex. T. iPack specified that it was "looking for agreement as to the costs associated with the production. We had that incorporated into the Confidentiality Agreement, along with a date by which we would be told of how the costs were being split between the parties." *Id.*

On October 31, 2013, Bell replied with a formal letter, via email and mail, noting Bell and GE found the costs inappropriate, requesting that the documents be submitted while the cost dispute was resolved, agreeing to pay the $1,372.49, but refusing to pay the other costs because they seemed related to reviewing the documents for privilege and relevance when Bell and GE

had offered to do that work themselves, at their own cost. *See id.* at Ex. U. The proposed process that iPack had rejected was described as follows:

> [iPack] would turn over the imaged hard drives for us to review on an outside counsel eyes only basis to identify the materials that we believe should be produced and where your client would reserve the right to object to (or withhold) the formal production of any identified materials on grounds of privilege, work product and/or relevance. Your clients rejected that proposed, highly efficient approach, and instead elected to incur significant legal fees by having their own counsel perform a detailed review that was not necessary.

*Id.* iPack did not respond until November 18, 2013, when it sent its own letter arguing the costs were reasonable, claiming for the first time that the initial subpoena was invalid, and averring that although Bell and GE were "correct . . . that a significant portion of the costs [iPack] incurred to comply with the Subpoena are associated with loading the documents in a system for attorney review for relevance and privilege, and for attorney time spent on that review . . . these are recoverable costs." *Id.* at Ex. V.

Bell issued its December 2, 2013 Subpoena from the "United States District Court for the District of South Dakota," calling for production by December 10, 2013, "[a]t the offices of iPack, LLC – to be sent to Cutler & Donahoe, LLP at the address below (cost of shipping paid by serving party)." *Id.* at Ex. W. Bell sent a letter explaining its position along with the Subpoena, and apparently iPack responded on December 16, 2013, with a letter that was not mailed and landed only in the spam email folders of Bell and GE. In its December 16, 2013 letter, iPack objected to the Subpoena, as it claimed the Subpoena:

(i) fails to provide a reasonable time for compliance given the scope of responsive documents;

(ii) compels our client to either produce trade secret or other confidential commercial information and privileged and protected matters by producing all documents in its possession *or* alternatively to be subjected to an undue burden and to incur significant expense to review and produce relevant documents given the scope of the subpoena; and

(iii) requires production beyond the geographical limits permitted.

*Id.* at Supp. Aff. of Counsel in Supp. of Pl.'s Mot. to Compel, Ex. A, at 2 (docket no. 7). Bell and GE did not discover this communication until after filing the Motion to Compel.

Bell filed the instant Motion to Compel on March 3, 2014, in this Court. iPack responded with a Motion to Quash the Subpoena on April 4, 2014, requesting an order quashing the Subpoena, or in the alternative, granting reasonable compensation for the expenses iPack incurred in production.

### III. LEGAL STANDARD

Discovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). "[T]he scope of discovery for a nonparty litigant under a subpoena duces tecum [is] the same as the scope of a discovery request made upon a party to the action," and "a party is entitled to information that is relevant to a claim or defense in the matter" at issue. *Smith v. United Salt Corp.*, No. 1:08-cv-00053, 2009 WL 2929343, at *5 (W.D. Va. Sept. 9, 2009). "It is well-settled that district courts are allowed broad discretion in resolving discovery disputes." *Id.* (citing *Carefirst*, 334 F.3d at 402).

Rule 45 of the Federal Rules of Civil Procedure governs demands upon nonparties for the production of persons or documents. A subpoena may command a nonparty to produce "documents, electronically stored information ["ESI"], or tangible things," and "must issue from the court where the action is pending." Fed. R. Civ. P. 45(a)(2). "A subpoena may be served at any place within the United States," but compliance for documents, ESI, or tangible things may be commanded "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(b)(2), (c)(2).

Nonparties are provided some protection by Rule 45 in both mandatory and discretionary ways. First, if a nonparty timely objects to a subpoena, a district court *may* require compliance upon the filing of a motion to compel, but in requiring compliance *must* protect a nonparty from significant expense resulting from compliance. Rule 45(d)(1) specifically requires that the issuing party

> take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required *must* enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

Fed. R. Civ. P. 45(d)(1) (emphasis added). If a nonparty wishes to object to a subpoena, it "may serve" the issuing party with "a written objection" to the subpoena, which "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). Upon objection, or upon a motion to compel production, "the court for the district where compliance is required" *may* require compliance, only as directed in an order, but that order "*must* protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." *Id* (emphasis added).

Second, a court in the district of compliance is mandated by Rule 45(d)(3) to quash or modify subpoenas in certain circumstances on timely motions to quash. Rule 45(d)(3) states: "On *timely* motion, the court for the district where compliance is required *must* quash or modify a subpoena that:"

> **(i)** fails to allow a reasonable time to comply;
> **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
> **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
> **(iv)** subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A) (emphasis added). In its discretion, a court in the district of compliance "*may*, *on motion*, quash or modify the subpoena if it requires . . . disclosing a trade secret or other confidential research, development, or commercial information . . . ." Fed. R. Civ. P. 45(d)(3)(B)(i) (emphasis added). A court may order production despite the possibility of disclosing trade secrets or other confidential information if the "serving party: (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and (ii) ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(C).

As these provisions make clear, a district court *must* quash or modify a subpoena to protect a nonparty in the circumstances enumerated in Rule 45(d)(3)(A), on a timely motion to quash. Fed. R. Civ. P. 45(d)(3)(A). It *may* quash or modify a subpoena that requires the disclosure of trade secrets or other confidential research, development, or commercial information, unless the serving party ensures reasonable compensation for the nonparty and shows a substantial need for the information that cannot otherwise be met without undue hardship. Fed. R. Civ. P. 45(d)(3)(B)–(C). A court may also enforce a subpoena under Rule 45(d)(2), upon timely objection by the nonparty and a motion to compel compliance, but upon the nonparty's timely objection, must protect the nonparty from significant expense related to compliance. Fed. R. Civ. P. 45(d)(2).

Finally, if the nonparty wishes to withhold subpoenaed information "under a claim that it is privileged or subject to protection as trial-preparation material," the nonparty must:

(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

Fed. R. Civ. P. 45(e)(2)(A). Rule 45(e)(2)(B) provides procedures by which a party can claw

back privileged or protected information that has been disclosed:

> If information produced in response to a subpoena is subject to a claim of
> privilege or of protection as trial-preparation material, the person making the
> claim may notify any party that received the information of the claim and the
> basis for it. After being notified, a party must promptly return, sequester, or
> destroy the specified information and any copies it has; must not use or disclose
> the information until the claim is resolved; must take reasonable steps to retrieve
> the information if the party disclosed it before being notified; and may promptly
> present the information under seal to the court for the district where compliance is
> required for a determination of the claim. The person who produced the
> information must preserve the information until the claim is resolved.

Fed. R. Civ. P. 45(e)(2)(B).

Rule 45 provides for attorney's fees and sanctions in two provisions. *See generally*

*Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 672 (N.D. Fla. 2010) (discussing issuing party

and complying nonparty's claims for attorney's fees under Rule 45). Rule 45(d)(1) mandates a

court to impose "an appropriate sanction—which may include lost earnings and attorney's fees—

on a party or attorney who fails to comply" with the rule's mandate that an issuing party "must

take reasonable steps to avoid imposing an undue burden or expense on a person subject to the

subpoena." Fed. R. Civ. P. 45(d)(1). Rule 45(g) allows a court to "hold in contempt a person

who, having been served, fails without adequate excuse to obey the subpoena or an order related

to it." Fed. R. Civ. P 45(g).

## IV. DISCUSSION

iPack's Motion to Quash essentially argues that this Court should shift the fees iPack

incurred in producing documents to Bell and GE because the production would impose an undue

burden on iPack or result in significant expense to a nonparty.[10]  iPack cites its limited financial

---

[10]  In its December 16, 2013 emailed letter, iPack objected to the deadline of the Subpoena as: failing to give a
reasonable time for compliance; compelling iPack to produced confidential, privileged and protected matters *or*
incur an undue burden to review the documents and exclude those matters; and requiring production beyond the

resources and argues that the production would either have required iPack to turn over irrelevant, trade secret, confidential, and privileged information, or to shoulder an undue burden in combing through the documents to exclude that information before disclosure.

First, Bell responds in its Motion to Compel and on reply to that Motion that iPack has taken on this burden for its own purposes: namely, it is an interested party in the outcome of GE and Bell's dispute, and benefits from its own document review. Since GE accuses iPack of selling Bell what may be an invalid patent application due to non-disclosed and unpatented prior art, Bell claims iPack has an interest in the South Dakota litigation. Furthermore, iPack voluntarily undertook the document review expenses it incurred, avers Bell. iPack refused Bell and GE's proposal that outside counsel for those parties search the hard drives, giving iPack the right to claw back and withhold formal production of any document that it deemed privileged, confidential, or protected after outside counsel had found the responsive documents. Second, Bell argues iPack cannot contest the Subpoena because it did not object or move to quash the subpoena in accordance with Rule 45's requirements. Third, Bell asserts that even a nonparty producing documents must normally bear the expense of doing so, and that cost-shifting to the issuing party is not normally allowed, especially where the nonparty is an interested party.

---

geographical limits permitted. *See* Supplemental Aff. of Counsel on Mot. to Compel, Ex. A, at 6. iPack still argues the Subpoena imposed an undue burden, but it has not raised the time for compliance or the geographical limits objections before this Court in any of its filings or oral arguments. I will therefore only address its assertions of undue burden and significant expense, though I note its other objections are without merit.

**A. Timeliness of iPack's Objection to the Subpoena and Motion to Quash**

**1. Objection to the Subpoena**

The Subpoena issued on December 2, 2013. Rule 45 requires that objections by a nonparty be served[11] "before *the earlier* of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B) (emphasis added). The Subpoena specified December 10, 2013, as its date for compliance. *See* Mot. to Compel, Ex. W. iPack objected in writing, sent by email to GE and Bell, on December 16, 2013, and through a Motion to Quash filed in this Court on April 4, 2014. Therefore, iPack did not strictly comply with Rule 45 in serving a written objection to the Subpoena before the date of compliance, December 10, 2013, although it did object in writing within 14 days of receiving the Subpoena.

Although "'[t]he failure to serve written objections to a subpoena within the time specified by [Rule 45(d)(2)(B)] typically constitutes a waiver of such objections,' . . . the failure to act timely will not bar consideration of objections in unusual circumstances and for good cause shown." *Leader Technologies, Inc. v. Facebook, Inc.,* No. C1080028MISCJWHRL, 2010 WL 761296, at *2 (N.D. Cal. Mar. 2, 2010) (citing *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 48 (S.D.N.Y. 1996)). Unusual circumstances warranting consideration of objections have included those "where counsel for the nonparty and for the subpoenaing party were in contact with respect to the nonparty's compliance prior to the time the nonparty challenged the subpoena." *Id. See also Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Taft*, No. CIV.A. 2:00-CV-1300, 2002 WL 31951263, at *2 (S.D. Ohio Nov. 18, 2002).

---

[11] It appears the Subpoena was served on December 2, via email, and sometime after that, by mail. The Subpoena is dated for December 2, 2013, but it does not say when it was served on iPack. Attached with it is a letter Bell sent to iPack explaining the Subpoena, also dated on December 2, 2013 and marked "Via Email and U.S. Mail." Mot. to Compel, Ex. X.

Here, I find that unusual circumstances exist such that there is good cause to consider iPack's December 16, 2013 objection to the Subpoena. iPack had been in communication with Bell and GE since August 2013, had already collected the relevant hard drives, had initiated the process of searching them with mutually-agreed-upon search terms, and had even completed some relevance and privilege review by the time Bell served the December 2, 2013 Subpoena. Although the Subpoena was served by email and mail to iPack, it is unclear exactly when iPack received service of that Subpoena. At most, iPack had eight days to comply with the Subpoena from the time it was issued and emailed to iPack, and those eight days include two weekend days. Given the number of documents involved and the lengthy discussions and developing disagreement among the parties about splitting the costs of production, I find good cause to excuse iPack's failure to object to the Subpoena by December 10, 2013. It was sufficient that iPack objected within Rule 45's 14-day deadline. *See, e.g.*, *Leader Technologies*, 2010 WL 761296, at \*2; *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund*, 2002 WL 31951263, at \*2; *cf.* Fed. R. Civ. P. 45, advisory committee's note on 1991 amendments (noting "[t]he 10-day period for response to a subpoena is extended to 14 days to avoid the complex calculations associated with short time periods under Rule 6 and to allow a bit more time for such objections to be made."); *City of St. Petersburg v. Total Containment, Inc.*, No. MISC. 07-191, 2008 WL 1995298, at \*2 (E.D. Pa. May 5, 2008) (finding motions to quash are "timely" under Rule 45 so long as filed by return date of subpoena, so long as the subpoena's compliance period is of "reasonable duration").[12]

---

[12] Bell cites case law by this Court and others, finding that a nonparty can waive its objections to a subpoena by submitting merely boilerplate motions to quash or objections to the subpoena months after the subpoena's service or return date. *See, e.g.*, *Hanwha Azdel, Inc. v. C&D Zodiac, Inc.* No. 6:12-CV-00023, 2013 WL 3660562 (W.D. Va. July 11, 2013); *In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344 (W.D. Va. 1999). However, those cases are not on point for whether iPack timely objected to the subpoena in this case. In *Hanwha Azdel*, the party had clearly delayed by saying it needed more time to produce documents, mischaracterized the record as to whether the other party had given it an extension to object to the subpoena, and submitted only boilerplate, untimely objections

## 2.  Motion to Quash the Subpoena

A court *must* quash a subpoena, "on *timely* motion," when the subpoena fails to allow a reasonable time to comply, requires a person to comply beyond the geographical limits in Rule 45(c),[13] requires disclosure of privileged or other protected matter, if no exception or waiver applies, or if the subpoena subjects a person to an undue burden.  Fed. R. Civ. P. 45(d)(3)(A) (emphasis added).  This examination is slightly different than asking about whether iPack *objected* to the subpoena in a timely fashion.  Unlike with objections, Rule 45 does not specify what "timely" means for filing motions to quash subpoenas.  However, *Hanwha Azdel, Inc. v. C&D Zodiac, Inc.* No. 6:12-CV-00023, 2013 WL 3660562, at *6 (W.D. Va. July 11, 2013), and *In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344, 349–50 (W.D. Va. 1999), have defined "timely" in the context of filing a motion to quash, finding that motions to quash were untimely when filed months after the date of a subpoena's service or its deadline for compliance. *See, e.g.*, *Hanwha Azdel*, 2013 WL 3660562, at *6; *Motorsports*, 186 F.R.D. at 349–50.

Other courts have similarly found that months-long delays in filing motions to quash made those motions untimely under Rule 45(d)(3).  *See, e.g.*, *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F. Supp. 2d 270, 278 (D.D.C. 2002) (noting courts differ on whether motions are timely filed after a subpoena's date of compliance, but finding motion filed in wrong forum three months after the subpoena's return date, and in right forum 10 months after

---

that never addressed the main issues. *Hanwha Azdel*, 2013 WL 3660562, at *6.  In *Motorsports*, the company only objected that the subpoena at issue had not been properly served, despite the fact that its corporate directors knew about the subpoena for months before objecting to it. *Motorsports*, 186 F.R.D. at 350.

[13] As noted earlier, iPack has not objected to the geographical limits of the Subpoena on this Motion to Quash.  Any objection by iPack that the Subpoena required discovery beyond the geographical limits in Rule 45(c) would be unavailing.  Rule 45(c) allows commanding production "within 100 miles of where the person resides, is employed, or regularly transacts business in person."  Fed. R. Civ. P. 45(c)(1)(A).  The Subpoena commands discovery "[a]t the offices of iPack, LLC – to be sent to Cutler & Donahoe, LLP at the address below (cost of shipping to be paid by serving party)."  Mot. to Compel, Ex. W at 1.  This is within 100 miles of where iPack resides and regularly transacts business through its warehouse in Lynchburg, Virginia.

that date, was untimely); c*f. City of St. Petersburg v. Total Containment, Inc.*, No. MISC. 07-191, 2008 WL 1995298, at *2 (E.D. Pa. May 5, 2008) (finding motion to quash filed one day after subpoena's return date was untimely).

iPack's motion to quash was filed on April 4, 2014, about three months after Bell issued the Subpoena. It was filed almost three months after December 10, 2013, the return date for the Subpoena. Under any standard, this does qualify as a "timely" filed motion under Rule 45. Therefore, this Court is not required to quash or modify the subpoena under Rule 45(d)(3)(A), and will not do so under that provision. Fed. R. Civ. P. 45(d)(3)(A).

### B. The Propriety and Equity of Cost-Shifting

Bell and iPack raise several issues regarding whether cost-shifting is appropriate in this case. First, Bell argues this Court cannot shift costs, because the data at issue is not inaccessible under Rule 45. Second, iPack seeks cost-shifting because it says the Subpoena either requires it to turn over trade secret or confidential information, or imposes an undue burden on iPack to exclude that information from production. Third, iPack avers that the Subpoena imposes significant expense, against which this Court is bound to protect a nonparty under Rule 45(d)(2)(B)(ii).

### 1. Inaccessible Electronically Stored Information

Rule 45(e)(1)(D) provides one situation in which a nonparty need not produce electronically stored information ("ESI"). Fed. R. Civ. P. 45(e)(1)(D). The Rule notes that a nonparty need not produce ESI if it is "not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 45(e)(1)(D). Even for inaccessible ESI, a court "may specify conditions for the discovery" and "nonetheless order discovery from such sources if the requesting party shows good cause." *Id.* Bell correctly argues that iPack would not be entitled to cost-shifting

because of the accessibility of the ESI in its possession. *See, e.g.*, *Zubulake v. UBS Warbug, LLC*, 217 F.R.D. 309, 318–19 (S.D.N.Y. 2003) (finding that cost-shifting between two parties to a lawsuit was appropriate "only where inaccessible data [was] sought," and explaining that media functioning much like a hard drive was not "inaccessible," as compared to media that had to be restored to a hard drive, then extracted as part of a lengthy process); *Zubulake v. UBS Warbug, LLC*, 216 F.R.D. 280, 284 (S.D.N.Y. 2003) (same). However, iPack's argument does not rely on the accessibility of the ESI in its possession, but on whether it is due costs because of an undue burden or significant expense imposed upon it for relevance and privilege review.

## 2. Trade Secret or Confidential Information and Imposition of an Undue Burden

A court *may* shift costs or quash a subpoena, in its discretion, in order "[t]o protect a person subject to or affected by a subpoena," where the court finds that the subpoena requires "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B). A court can also protect a nonparty subject to a subpoena "from significant expense resulting from compliance" if the nonparty filed an objection to the subpoena. Fed. R. Civ. P. 45(d)(2)(B). Finally, an issuing party "must take reasonable steps to avoid imposing undue burden or expense on a [nonparty] subject to the subpoena," and I must "enforce this duty." Fed. R. Civ. P. 45(d)(1). Since iPack made an objection which I will consider, as discussed above, these protections apply.

I find that the Subpoena does not require iPack to disclose trade secrets or other confidential research, development, or commercial information, based on the filings and Mr. Scott's testimony that the hard drives contain no information of value to iPack. Mr. Scott alleged that the Subpoena would require disclosure of the personal financial information of iPack's owners, and of confidential information of its former employees. I find Mr. Scott alleges

disclosures that Rule 45(d)(3)(B) does not cover. These do not qualify as disclosures of "trade secret[s] or other confidential research, development, or *commercial* information," and this sort of information is exactly the kind of information an agreement with a claw back provision would be designed to encompass.[14] Fed. R. Civ. P. 45(d)(3)(B) (emphasis added).

I will analyze together whether the Subpoena imposes an undue burden, and whether it imposes significant compliance expense on iPack. *See* Fed. R. Civ. P. Fed. R. Civ. P. 45(d)(1), (d)(2)(B). iPack's major contention is that Bell and GE should have to pay for the costs of its privilege and relevance review, because it would not be fair or lawful for iPack to have to turn over all of its confidential, protected, and privileged information, and it should not have to pay for redacting this information as a nonparty to the litigation. *See generally Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 444–46 (D. Md. 2012) (noting that under Federal Rule of Evidence 502(b), disclosure of a privileged or protected document may result in a waiver unless it was inadvertent, a person took reasonable steps to prevent disclosure, or a person objected to disclosure and obtained a protective order or some other protection); Fed. R. Ev. 502(b), (d), (e) (noting parties in a federal proceeding may waive privilege or protection claims through inadvertent disclosure, but that a court order may prevent waiver, as may an agreement between the parties for the parties to the agreement). Yet, "a party is entitled to information that is relevant to a claim or defense in the matter" at issue, and even a nonparty is normally expected to bear some or all of the costs of discovery. *United Salt Corp.*, No. 1:08-cv-00053, 2009 WL 2929343, at *5 (W.D. Va. Sept. 9, 2009); *In re World Trade Ctr. Disaster Site Litig.*, No. 21 MC

---

[14] I note that even if the Subpoena required disclosure of some confidential or commercial information, I would still order production because Bell has shown "a substantial need for the testimony or material that cannot be otherwise met without undue hardship," and this order ensures iPack is provided with reasonable compensation. Fed. R. Civ. P. 45(d)(3)(C). iPack alone has many of the documents relevant to GE's claim that iPack made its provisional patent application based on prior art. Bell has alleged, and iPack has not rebutted, that Bell cannot obtain most of this information from any other source.

100 AKH, 2010 WL 3582921, at *1 (S.D.N.Y. Sept. 14, 2010); *In re First American Corp.,* 184 F.R.D. 234, 241 (S.D.N.Y. 1998).

When discovery involves the parties to a case, courts in this district have adopted a variety of solutions to control costs related to confidential information, including shifting the costs of production but not of privilege review, limiting the scope of discovery to control costs, and ordering production under claw back provisions. *See, e.g.*, *Adkins v. EQT Prod. Co.*, No. 1:10-cv-00041, 2012 WL 5465491, at *4 (W.D. Va. May 31, 2012) (collecting cases with varying solutions) *objections overruled sub nom. Adair v. EQT Prod. Co.*, No. 1:10CV00037, 2012 WL 2526982 (W.D. Va. June 29, 2012).

Courts in this district have found that it is untenable for a party to insist on individually reviewing all documents for privilege and responsiveness, rather than producing documents under a protective order with a claw back provision. *See, e.g.*, *Adair*, 2012 WL 2526982, at *5; *see also Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003) ("[M]any parties to document-intensive litigation enter into so-called 'claw-back' agreements that allow the parties to forego privilege review altogether in favor of an agreement to return inadvertently produced privileged documents."); *Rajala v. McGuire Woods, LLP*, Civil Action No. 08–2638–CM–DJW, 2010 WL 2949582, at *5 (D. Kan. July 22, 2010) (finding a claw back provision may "protect a party or parties from the undue burden and expense of reviewing vast numbers of documents for privilege before they are produced."). In *Adair*, the court found that "the bulk of trending case law and the recent amendments to the rules indicate" that the defendant's insistence upon a "search for privileged and responsive documents [being] done by human beings on an individual document basis" was "untenable." *Adair*, 2012 WL 2526982, at *5 (collecting cases).

Under this framework, iPack's insistence on shifting its privilege and responsiveness review costs to Bell is unwarranted. Of course, *Adair* and the other cases are not directly on point, because they involve parties to an action. Rule 45 provides additional protections to nonparties to ensure they do not suffer an undue burden or significant expense resulting from compliance. In balancing these protections against a party's need for discovery and the general assumption that the complying party bears the costs of production, courts have used a multi-step inquiry to determine the equity of shifting costs. These factors include: "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance." *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 928–29 (N.D. Ill. 2010).

Many other factors are also considered by courts, including "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena," along with "the particularity with which the documents are described and the burden imposed." *Boykin Anchor Co., Inc. v. Wong*, No. 5:10-CV-591-FL, 2012 WL 27328, at *2–3 (E.D.N.C. Jan. 4, 2012) *reconsideration denied*, 5:10-CV-591-FL, 2012 WL 937182 (E.D.N.C. Mar. 20, 2012). In this case, Bell asserts it cannot obtain the documents from any other source and that the discovery sought is relevant and has been cabined by agreed-upon search terms. I find that Bell has defined the discovery it seeks with sufficient particularity, especially after Bell and GE agreed to certain search terms, that the discovery is highly relevant to Bell and GE's dispute, and that the parties would suffer great hardship if iPack did not produce as required. Accordingly, the equity of cost-shifting will depend on the factors enumerated in *DeGeer* and applied in many other cases.

## 1. Interested Party

Black's Law Dictionary defines an "interested party" as "[a] party who has a recognizable stake (and therefore standing) in a matter." Black's Law Dictionary (9th ed. 2009). When the nonparty producing materials has a potential interest in the underlying litigation, courts have weighed that interest against shifting the costs of production to the requesting party. *See, e.g.*, *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 206–07 (D. Conn. 2009); *Miller v. Allstate Fire & Cas. Ins. Co.*, 73 Fed. R. Serv. 3d 394, at *4–5 (W.D. Pa. 2009); *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 85–87 (D. Mass. 2008). In *Behrend*, the court declined to grant a nonparty the costs of reviewing documents for privileged or confidential information before turning them over because it found that nonparty had participated in a transaction that helped spawn the underlying litigation. *Id.* Although the nonparty was no longer involved in that industry and claimed the production would involve great financial burden on its small company, the court approved a plan to produce the documents, and said that if the nonparty wished to "conduct a privilege review [itself] before production, despite greater expense," this would be "purely [the nonparty's] decision to make." *Id.* at 87.

In *Konover*, the nonparty moving for recovery of the costs of production was controlled by some of the same officers at issue in the underlying action, had a financial interest in one of the transactions challenged, and was represented by the same law firm as some of the parties in the action. *Konover*, 259 F.R.D. at 206–07. This weighed against awarding the nonparty its costs, as the court found it was not a disinterested nonparty. *Id.* at 207. In *Miller*, the court split costs because the nonparty appeared interested in the case but only moderately able to bear the cost of production, while the information requested was highly relevant to the claims at issue and greatly needed by the parties. *Miller*, 394 F.3d at *4–5. *See also In re Mushroom Direct*

*Purchaser Antitrust Litig.*, No. 06-0620, 2012 WL 298480, at *7 (E.D. Pa. Jan. 31, 2012) (requiring issuing party to pay for costs of production but not ruling on privilege or relevance review, counting cases noting that a nonparty that is not "a classic disinterested non-party," might be ordered "to produce the documents at its own expense.").

I find that iPack qualifies as an interested party in this case. This factor weighs against an award of the total costs of production to iPack, and especially weighs against awarding the costs of iPack's self-induced privilege review. GE's counterclaim in the underlying lawsuit alleges that the light-bulb packaging patent is invalid and unenforceable by Bell, in part because iPack sold it to Bell after withholding material information about the use of prior unpatented art in developing the invention in the patent. *See* Answer at ¶¶ 24–25, 28–31, 34–36, 37, Bell, Inc. v. GE Lighting, LLC, No. 4:13-cv-04009 (D.S.D. May 24, 2013), ECF No. 8. Although iPack disputes whether it infringed its agreement with Bell even if GE's allegations are true, it seems likely iPack could be involved in future litigation over these issues if GE is able to prove the light-bulb packaging patent is invalid due to prior art or iPack's inequitable conduct. Furthermore, GE's Answer in the D.S.D. litigation alleges that Thomas Scott, the iPack officer who testified before this Court, was one of the named inventors on iPack's provisional application. Answer, ¶ 23, Bell, Inc. v. GE Lighting, LLC, No. 4:13-cv-04009 (D.S.D. May 24, 2013), ECF No. 8. It also alleges that GE employees disclosed prior art to Scott that became part of the design, but was never disclosed to Bell. *Id.* If these allegations are true, iPack's attempts to sort through the documents itself for relevance, privilege, and confidentiality may stem from a desire to protect reputational interests, along with iPack's interests in avoiding future litigation over iPack's agreement with Bell. I find that iPack is an interested party in this litigation.

## 2. Financial State of Nonparty

As Thomas Scott testified at the hearing, iPack is in fairly poor financial condition. The only major asset is a manufacturing plant and warehouse building in Lynchburg, Virginia, which sometimes provides just enough revenue to cover the debts on the building. Mr. Scott testified that at other times, iPack operates at a loss, and he and his father-in-law, Fred Buehler, personally keep the company solvent. iPack alleges that the principals of the corporation will have to cover the $14,000 in disputed legal fees if the Court does not shift costs. This Court has little information about Bell's finances. Bell and GE do not dispute the $1372.49 in copying costs, and have agreed to pay these costs to iPack.

This factor weighs in favor of iPack – except that iPack undertook relevance and privilege review on its own, taking on costs despite GE and Bell's alternate plan to have outside counsel conduct all of this work separately, with a provision for iPack to object to production of any privileged or protected documents that were ultimately part of the responsive group. iPack never disclosed the costs it incurred until after much of the work had been done, although it seems the amount of production and discovery was somewhat surprising to iPack as the situation evolved and it gathered more hard drives and documents. iPack has also been dilatory in corresponding with Bell and GE's counsels throughout this process, often requiring prompting and finally requiring a motion to compel before it moved to quash the Subpoena.

I find that iPack's financial state weighs in favor of shifting some of the costs of production back to Bell and GE, but that iPack has assumed some of these costs by failing to secure an agreement about costs earlier in the process, and by refusing to come to an agreement under which Bell and GE could perform the work while still preserving iPack's privilege and protection objections. *See generally* Fed. R. Ev. 502(d), (e).

### 3.  Litigation of Public Importance

The underlying litigation does not appear to be of particular public importance.  Although broad and potentially important questions may be affected by whether GE infringed a patent in moving its operations overseas, the dispute as it involves iPack is very specific to whether GE infringed this particular light bulb packaging patent, and to whether the patent is valid.  The instant matter is unlike litigation involving class action suits or other issues of more widely public concern.  *Cf. Behrend v. Comcast Corp.*, 248 F.R.D. 84, 85–87 (D. Mass. 2008) (finding class action involving whether Comcast violated the Sherman Antitrust Act through unlawfully trying to prevent and eliminate competition was a matter of public importance).  This factor weighs against shifting the costs of production to Bell and GE.

### 4.  Conclusion

Although its poor financial state weighs in its favor, the factors mostly weigh in favor of iPack retaining most of the costs of production.  I will enforce Bell and GE's agreement to pay the $1,372.49 in copying costs.  These costs of production are the kind of costs for which a nonparty would often be entitled to compensation under Rule 45.  I find that Bell and GE took reasonable steps to avoid imposing an undue burden or expense on iPack, and therefore iPack is not entitled to relief under Rule 45(d)(1).  The parties submitted fairly narrowly-tailored requests to iPack, which ultimately resulted in responsive material on two hard drives.  *See* Br. in Supp. of Mot. to Compel, Ex. C.  Bell and GE also offered to have outside counsel sort through this material for responsiveness, allowing iPack to object to and formally withhold any identified materials on grounds of privilege, confidentiality, or protected content.  iPack refused this option, preferring to load the documents onto a database and search the documents itself.

However, at this junction, around 28,000 potentially responsive documents had been identified. Br. in Supp. of Mot. to Quash 7. Bell and GE agreed to a set of search terms iPack could use to find responsive documents, and iPack informed the parties it was proceeding with that search. That search revealed over 11,000 potentially responsive documents. *Id.* Coming to an agreement about relevant search terms is one way in which Bell and GE avoided imposing an undue burden on iPack, and apparently none of the parties discussed who was to pay for the loading and searching of the documents when iPack agreed to run the list of search terms. Bell and GE had represented that they would pay for the costs of production, although no one specified what that would entail, and the parties had notice that iPack would run a search of the documents.

iPack's financial condition and the dealings between the parties weigh in favor of imposing the costs of that database creation and search on Bell. *See, e.g.*, *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 672–73 (N.D. Fla. 2010) (commanding issuing party to pay nonparty the reasonable costs to conduct computer searches, but noting a nonparty is not entitled to unreasonable costs, or costs "disproportionate to the demands made," or greater than the costs to comply incurred by similarly situated persons); *Prescient Acquisition Grp., Inc. v. MJ Publ'g Trust*, No. 05 CIV.6298(PKC), 2006 WL 2996645, at *2–3 (S.D.N.Y. Oct. 13, 2006) (analyzing the dealings between the parties, notice of certain costs, and the parties' interests, and imposing 100% of the production costs and 50% of the attorney's fees incurred by a nonparty in responding to a subpoena). This is especially true since Bell and GE will benefit from being able to search through the documents on this database henceforth.

Imposing upon Bell the $1,372.49 in copying costs, plus the $4,770 in database loading and searching costs, fulfills my duty to ensure the Subpoena did not impose an undue burden on

iPack, and my duty to protect iPack from "significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(1), (d)(2)(B). "'Protection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance,'" *Prescient Acquisition Grp.*, 2006 WL 2996645, at *2 (quoting *In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C.1992)). Instead, "a non-party can be required to bear some or all expenses where the equities of a particular case demand it." *Id.* (citing *In re Exxon Valdez,* 142 F.R.D. at 383 (citation omitted)).

In this particular case, the equities demand that Bell bear the costs noted above, totaling $6,142.49, and that iPack bear the remaining $10,687.51 that it primarily spent on reviewing individual documents generated by the search parameters for relevance, privilege, and protected material. iPack is no ordinary disinterested party in these circumstances. Furthermore, it took on the costs of individual responsiveness and privilege review despite perfectly reasonable alternatives. It did so for its own reasons, but protecting the personal financial information of its owners, potentially reputational interests, and information of no value to iPack are insufficient reasons for this Court to impose costs on Bell. *See In re World Trade Ctr. Disaster Site Litig.*, No. 21 MC 100 AKH, 2010 WL 3582921, at *2 (S.D.N.Y. Sept. 14, 2010). If iPack is later drawn into related litigation, it might benefit from this document review. At the very least, iPack's insistence on doing this review itself is an untenable position, especially since this review significantly delayed production and Bell and GE consistently had to prompt iPack on its progress throughout the discovery process.[15] *See cf. Adair*, 2012 WL 2526982, at *5; *Konover*, 259 F.R.D. at 206–07; *Miller*, 73 Fed. R. Serv. 3d at *4–5; *Behrend*, 248 F.R.D. at 85–87.

---

[15] iPack makes much of the fact that the D.S.D. protective order only provides for claw back of inadvertently produced documents. This argument proves irrelevant, because the agreement Bell and GE proposed, long before that order's entry, would have allowed iPack to review only the responsive documents identified by outside counsel for privilege, withholding those it did not wish to produce. As an interested party, iPack must bear the costs of its privilege and protection review, whether under that agreement, or in this situation where iPack failed to disclose the costs it had incurred until late in the process and then refused to turn over the documents until paid in full.

## C. Bell's Request for Attorney's Fees

In its Motion to Compel, Bell asked this Court to award it the attorney fees and expenses related to its efforts to enforce compliance. iPack has stated in its filings and during the hearing that it does not seek attorney's fees related to communicating with counsel regarding the discovery or with filing its objections or Motion to Quash. Even if iPack did seek attorney's fees, no fees or sanctions under Rule 45 are warranted in this case.

Under Rule 45(d)(1), I have found that Bell took reasonable steps to avoid imposing an undue burden or expense on iPack, so no sanction or attorney's fees are due iPack. Fed. R. Civ. P. 45(d)(1). Under Rule Rule 45(g), I could hold iPack in contempt for failing "without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P 45(g). However, it appears iPack has mostly attempted to cooperate with Bell and GE since the parties began discovery in August 2013. Although all parties could have been clearer about how costs would have been distributed, and iPack could have been timelier in keeping Bell and GE updated about the progress of discovery, it appears the parties have attempted to resolve this matter amongst themselves. Once the December 2 Subpoena issued, iPack filed objections within 14 days and promptly responded to the Motion to Compel filed in this Court. iPack has refused to turn over the discovery until the cost dispute has been resolved, which is an understandable position. *See generally Angell v. Kelly*, 234 F.R.D. 135, 139–40 (M.D.N.C. 2006) (finding that since nonparty did not wait for court order to produce documents, it did not "have a right to seek reimbursement post-production based on Rule 45."). Therefore, I decline to hold iPack in contempt for failing to comply with the Subpoena, and I deny Bell the attorney's fees and expenses it has incurred in attempting to secure iPack's compliance.

**V. CONCLUSION**

In conclusion, I find that the equities in this case require iPack to bear the majority of the costs it incurred in complying with the Subpoena. I require Bell[16] to bear the $1,372.49 in copying costs it has already agreed to cover, as well as the $4,770 in costs incurred to load the documents onto a database and search them with a list of terms to which Bell and GE agreed. **However,** since Bell and iPack have not discussed the reasonableness of the $4,770 figure, I will give Bell fourteen (14) days from the entry of this order to so object. Since iPack is not a traditional disinterested nonparty, and since iPack refused reasonable alternatives to accomplish the same ends, I require iPack to bear the $10,687.51 it incurred in individually reviewing the documents for responsiveness and privilege. I will not award further attorney's fees or impose sanctions on either party under Rule 45, and I **DENY** Bell's request for those fees in the Motion to Compel.

I hereby **ORDER** Bell to pay iPack a total of $6,142.49 within five days of iPack's complete production under the Subpoena, and **ORDER** that if Bell objects to the reasonableness of the $4,770 claimed by iPack, it should file a motion so objecting within fourteen (14) days of this order's entry. iPack will have fourteen (14) days to respond to any objection, and Bell will have seven (7) days to reply.

According to the filings before this Court, iPack had reviewed and was prepared to produce only a portion of the potentially responsive documents at the time the Subpoena issued. iPack is hereby **ORDERED** to produce those documents which have already been reviewed within ten (10) days of the entry of this order, along with a privilege log complying with Rule 45 that identifies those documents it withholds. iPack is **FURTHER ORDERED** to either: (1)

---

[16] I can only impose costs on Bell, as this Court lacks jurisdiction over GE. If Bell wishes to share these costs with GE, it will have to raise that matter before the district court in South Dakota.

produce all other documents commanded by the Subpoena within fifteen (15) days of this order's entry, or (2) within that time, to enter into an agreement with Bell and GE to produce the remaining documents on a specified time line. That agreement must specify deadlines for review and production. Of course, iPack may elect to continue conducting its own privilege review, or it may enter into an agreement or stipulated court order protecting its rights to withhold privileged and protected information. I note that, should iPack elect to continue conducting its own privilege review, it is **ORDERED** to bear those costs and to comply with any deadlines in any agreement it makes with Bell and GE.

It is so ordered.

Entered this 23rd day of April, 2014.


NORMAN K. MOON
UNITED STATES DISTRICT JUDGE